UNITED STATES *v.* WATTS.

(*District Court, D. California.* November, 1882.)

FUGITIVES FROM JUSTICE—EXTRADITION TREATY CONSTRUED.

An extradited fugitive cannot, under the treaty of 1842 between the United States and Great Britain, be held to answer for any other offense than that for which he has been surrendered.

HOFFMAN, D. J. The prisoner having been arraigned on three indictments found against him in this court interposed a plea to the jurisdiction of the court to the effect that he had been extradited by Great Britain at the request of the United States; that the offenses charged in the requisition, and on which he has been surrendered, are other and different offenses from those alleged in the indictments to which he is now called on to plead; and that the said last-mentioned offenses are not mentioned or enumerated in the treaty between the United States and Great Britain; wherefore he says that he cannot and ought not to be put on his trial for such offenses, or restrained of his liberty, except to answer to the offenses for which he was extradited. To this plea the United States demurred. The validity of the claim set up on the part of the prisoner depends on the solution of two questions: *First.* What is the true construction of the tenth article of the treaty of 1842 between the United States and Great Britain? *Second.* How far are the judicial tribunals of the United States and of the states required to take cognizance of, and in proper cases give effect to, treaty stipulations between our own and foreign governments?

At the outset of the discussion two propositions may be laid down as incontrovertible: *First.* Whatever speculative views may have

been taken by jurists of America as to the duty of sovereign states, on grounds of comity or by the laws of nations, to deliver up fugitives on the demand of foreign states whose laws they are charged with having violated, in the United States it has long been the established rule "neither to grant nor to ask for extradition of criminals, as between us and any foreign government, unless in cases for which stipulations have been made by express convention." 6 Op. Atty. Gen. 431; *Com.* v. *Hawes,* 13 Ky. 697; *Holmes' Case,* 14 Pet. 593; Law. Wheat. Internat. Law, 233. *Second.* "A treaty is in its nature a compact between two nations, not a legislative act. It does not generally effect of itself the object to be accomplished, except so far as its object is infraterritorial, but is carried into execution by the sovereign powers or the respective parties to the instrument. In the United States a different principle is established. Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in the courts of justice as equivalent to an act of the legislature whenever it operates of itself without the aid of any legislative provision." *Foster* v. *Neilson,* 2 Pet. 253, per Chief Justice MARSHALL. "When, therefore, it is provided by treaty that certain acts shall not be done, or that certain limitations and restrictions shall not be disregarded or exceeded by the contracting parties, the compact does not need to be supplemented by legislative or executive action, to authorize the courts of justice to decline to override those limitations, or to exceed the prescribed restrictions, for the palpable and all-sufficient reason that to do so would be, not only to violate the public faith, but to transgress the ' supreme law of the land.' " *Com.* v. *Hawes,* 13 Ky. 702.

It results as a necessary consequence of the duty imposed on the courts to respect and obey the stipulations of a treaty as the supreme law of the land, that they are also charged with the duty of determining its meaning and effect, and this duty they must conscientiously and firmly perform, even though the construction they feel compelled to give to it should differ from that given to it by the political branch of the government.

In the long and able correspondence between Mr. Fish and Lord Derby, with reference to the extradition of Winslow, the position apparently assumed by the latter at the outset, to the effect that the British government might, by act of parliament, modify and introduce new conditions into an existing treaty with the United States, without the assent of the latter, seems to have been virtually abandoned. The ground finally taken by Lord Derby was that-

"The act of parliament in question (that of 1870) imposed **no** condition new in substance upon the treaty of 1842, inasmuch as the true meaning of that treaty is that a person accused of a specified crime or specified crimes shall be delivered up to be tried for the crime or crimes of which he is accused, and an agreement between the two powers that the right of asylum equally valued by both shall be withdrawn only in respect of certain specified offenses, implies as plainly as if it were expressed in distinct words that in respect of the offense or offenses laid to his charge, and such offense or offenses only, is the right of asylum withdrawn; and that as a consequence, independently of the act of 1870, it is the duty of each government to see that the treaty obligations in that respect are recognized and observed by the receiving power." Lord Derby to Col. Hoffman, June 30, 1876.

Mr. Fish, on the other hand, contended that the receiving power has the right, if so inclined, after having tried the extradited person on the charge on which he has been surrendered with a *bona fide* intent and effort to convict him on that one charge, to try him for any other offense of which he may have been guilty.   Mr. Fish to Mr. Hoffman, May 22, 1876; Messages & Doc. Dep. State, 1876-77.

With this important and irreconcilable divergence of opinion between these eminent statesmen the correspondence terminated, and the United States for a time declined to make or entertain any demand for the surrender of fugitives under the treaty.   That it has since gone into operation is evident; but upon what adjustment, if any, of the controverted question the court is not informed.   But it is understood that the assertion by the district attorney of the right and of his purpose to try the prisoner for offenses other than those for which he was surrendered, and which are not extradition crimes, is not made under express instructions from the government.   The court, however, must regard him as its representative, and as acting under its authority, and must determine the questions submitted to it as if his action were taken by its express direction.

There is no reason to suppose that when the treaty was negotiated Lord Ashburton or Mr. Webster intended that the rights it conferred, or the obligations it imposed, should be other than those usually considered to result from similar agreements for the extradition of fugitives from justice.   The opinions, therefore, of jurisconsults and writers of eminence on international law may profitably be consulted, to ascertain what, in their judgment, are the rights and duties of the receiving power to whom a fugitive has been surrendered for trial for a specified offense.

In the memorable debate in the house of lords on Earl Granville's motion for further correspondence respecting extradition, the lord

chancellor, in an elaborate defense of the position assumed by Lord Derby, reproduces the opinions of the great jurists of the continent whom he had consulted. He cites Faelix, Kliut, and Heffter, and a case mentioned in Dalloy's Jurisprudence. It is unnecessary to incumber this opinion by inserting at length the various citations from those authorities contained in the speech of his lordship. It will be sufficient to state one of the general rules laid down by Faelix "The person who is surrendered cannot be prosecuted or condemned except for the crime in respect to which his extradition has been obtained." The other authorities are equally explicit. Indeed, there seems, so far as I can discover, a common *consensus* of jurists on the subject. See 10 Am. Law Rev. 618, and authorities cited.

In the circular of the French minister of justice of 1841, the theory of the French law on the point under consideration is laid down with great fullness: "The order of extradition," he says, "states the act upon which it is founded, and that act alone should be investigated; whence it follows that if during the trial of the crime for which extradition has been granted proofs are discovered of another crime, a new demand in extradition must be made." He goes further and holds that even if the surrender be made for a crime and also for a misdemeanor, the accused can only be put upon his trial for the former. After observing that "extradition should never be claimed or granted for trifling offenses," he adds: "Il faut une raison puissante pour faire rechercher sur la terre étrangère l'homme qui s'est puni par l'éloignement volontaire de sa patrie."

"Extradition can only be admitted with regard to a person accused of an act punishable with severe and degrading punishment, (*peine afflictive ou infamante;*) that is to say, of a crime other than a political crime, and not of a misdemeanor, (*delit.*) It follows that if extradition has been obtained of a person accused at once of a crime and a misdemeanor, he ought not to be put on his trial for the misdemeanor." Cited in Clarke, Extrad. c. 11, p. 161.

This rule would *a fortiori* apply when it is proposed to try the person extradited for an offense for which his surrender could not have been asked and would not have been granted.

It is manifest from the foregoing that the position taken by Lord Derby finds abundant support in the opinions of continental jurists, and in the practical interpretation given by France to the rights acquired by the extradition of a criminal.

I now come to the treaty itself.

It enumerates seven crimes for which the surrender of the fugitive may be demanded. It will not be disputed that this enumeration is exclusive, and that the fugitive can be demanded for the enumerated crimes and for none others. No clearer case for the application of the familiar rule *expressio unius est exclusio alterius* can easily be imagined. But if any doubt be felt on the point it will be dissipated by adverting to the language of President Tyler in his message communicating the treaty to congress:

"The article on the subject in the proposed treaty is carefully confined to such offenses as all mankind agree to regard as heinous and destructive of the security of life and property. In this careful and specific enumeration of crimes, the object has been to exclude all political offenses and criminal charges arising from wars or intestine commotions. Treason, misprision of treason, libels, desertions from military service, and other offenses of a similar character are excluded."

It is true that the treaty does not in terms prohibit the trial of the surrendered fugitive for crimes other than those mentioned in the treaty. "But, [as is well said by the supreme court of Kentucky in *Com.* v. *Hawes*,] if the prohibition can be fairly implied from the language and general scope of the treaty, considered in connection with the purposes the contracting parties had in view, and the nature of the subject about which they were treating, it is entitled to like respect and will be as sacredly observed as though it were expressed in clear and unambiguous terms." 13 Ky. 704.

To what end this careful and exclusive enumeration of offenses, if, after surrender for any one of them, the person may be tried for other offenses not included in the enumeration? And what, on such a construction, becomes of the guaranty and safeguard relied on by President Tyler? Can it be supposed that the eminent persons by whom the treaty was negotiated in effect said to each other: "You shall not demand nor will we surrender a fugitive except for the enumerated offenses; but if you can make out a *prima facie* case against him for an extradition crime, you may, after trying him for that crime and after an acquittal, which may show that he never should have been demanded or surrendered, try him for any other offense he may have committed?"

Nor is it easy to see how the surrendered person is protected from trial for a political offense, if this construction of the treaty be admitted. If he can be tried without violating the letter or spirit of the treaty for any non-enumerated offense, why not for a political

offense? It has been said that public sentiment in Great Britain and the United States would render such a proceeding impossible. But President Tyler rested the guaranties of immunity to political refugees on something more stable and reliable than the prevailing public sentiment of either country. He evidently thought that they were to be implied from the treaty itself.

It has been urged that the right of asylum for political offenders is so universally recognized as sacred and inviolable that an infringement of it was, like a parricide at Athens, not to be treated as possible. But jurists of the same country are not always agreed as to what constitutes a political offense. Nor on a question so often difficult and delicate can it be expected that two governments will always be of one mind. If, then, the right of the receiving power to try the surrendered person for any offense of which he may have been guilty (having first tried him *bona fide* for the extradition offense) be admitted, it might well happen that the receiving power might in perfect good faith hold the prisoner to answer for an offense which the surrendering power would consider strictly political in its character. But the treaty is explicit that the surrendering power is the sole and final judge, not only of the adequacy of the proofs submitted on a demand for a surrender, but of the question whether the facts proved constitute an extradition offense under its laws, and especially whether under those laws the offense is political in its character. On the construction contended for this right would practically be denied, and the immunity of political offenders so jealously maintained and carefully guarded by both the contracting parties might thus effectually be destroyed.

The legislation of both Great Britain and the United States appears to have given a practical construction to the treaty in accordance with the views I am attempting to maintain. The British act of Parliament of 1843, which was passed to carry into effect the treaty of the preceding year, provides (section 3) that "upon the certificate of a justice of the peace," etc., "it shall be lawful for one of Her Majesty's principal secretaries of state, * * * by warrant, under his hand and seal, to order the person so committed to be delivered to such person or persons as shall be authorized, in the name of the United States, to receive the person so committed, and to convey such person to the territories of the United States *to be tried for the crime of which such person shall be so accused.*" The words "and for that crime alone," or "for none other," are not, it is true, found in the act, but

the motive and object of the surrender are so explicitly stated that the statute, on every principle of fair and rational interpretation, should be construed as if those or equivalent words had been inserted. The language of our own act of congress of 1848 is identical with that of the British act. It directs the person so committed to be delivered, etc., "*to be tried for the crime of which such person shall be so accused.*"

The same language is used in the warrant under which the fugitive is surrendered. But if, by a fair construction of the treaty, the extradited person, after being tried for the offense of which he has been "so accused," may be tried for any other offense, neither the law nor the warrant express the whole object of the surrender. Will it be contended that any secretary of state would venture, under the act, to issue a warrant directing the surrender of the fugitive to be tried for the offense of which has been accused, and, after such trial, to be tried for any other offense which may be charged against him? To put this question is to answer it.

I will now briefly advert to the authorities. The first to which I shall refer is the case of *Com.* v. *Hawes*, already frequently cited in this opinion, and the able, conclusive judgment in which I have freely availed myself of, without, I fear, adding much to its force. The prisoner had been surrendered by the authorities of the dominion of Canada for the crime of forgery. On this charge he had been tried and acquitted. He was then required to plead to an indictment for embezzlement. The court refused to try him for that offense, and directed his discharge. The ruling of the court was unanimously affirmed on appeal by the court of appeals of Kentucky. It will be noted that this decision was rendered in April, 1878, long subsequently to the correspondence between Mr. Fish and Lord Derby, and with full knowledge of the decisions in *Caldwell's Case*, and *Lawrence's Case*, hereafter to be noticed. It will also be observed that in this case a state court declined jurisdiction of an offense committed within the territory of a state. The court holds: (1) That the trial of extradited criminals for crimes other than those *named in the treaty and in the warrant of extradition* is not prohibited in terms by the treaty of 1842; but such prohibition is clearly implied from the language and general scope of the treaty, and this prohibition should be as sacredly observed as though it were expressed in clear and unambiguous language. (2) The right of one government to demand and receive from another the custody of an offender who has sought an asylum upon

its soil, depends upon the existence of treaty stipulations between them, and *in all cases is derived from, and is measured and restricted by, the provisions, express or implied, of the treaty.*

The same conclusion was reached by the supreme court of New York in the case of *Adriance* v. *Lagrave*, 1 Hun, 689. The court holds that—

"When the defendant was extradited it was for the purpose of answering the crime mentioned in the proceedings taken against him, and for no other purpose whatsoever. As to all other matters, being absolutely beyond the reach of the laws of this state, he was absolutely entitled to his freedom. He was extradited for a single special purpose, that of being tried for the crime for the commission of which he was removed from the protection of the laws of France. Beyond that, he was entitled to the protection of those laws so far as his personal liberty would have been secured by them in case no removal of his person had been made. In the language of the treaty, he was delivered "up to justice" because he was accused of one of the crimes which it enumerated, and it was implied in his surrender that he should be at liberty to return again to France when the purposes of justice had been performed in the charge made against him. The nature of the treaty, as well as good faith with the foreign power entering into it, will permit no other construction."

The prisoner was in this case discharged from *arrest on civil process*. This judgment was reversed by the court of appeals in 59 N. Y. 110, but not upon any claim that on the principles of international law or by the terms of the treaty a prosecution for an offense other than the offense for which surrender has been made was permissible. On the contrary, the immunity claimed is pronounced by the court "eminently just in principle." The decision turned upon the supposed inability of the court to interfere. After referring to the British act of 1870, the court observes:

"Congress doubtless has power to pass an act similar to the English act referred to, as the whole subject is confided to the federal government. It has exercised this power by passing an act to protect fugitive criminals from lawless violence." 15 St. at Large, 337. *"That these provisions ought to be extended to protection from other prosecutions or detentions I do not doubt; but until this is done by the law-making power by treaty or statute,* we feel constrained to hold that the courts cannot interfere."

The question whether the treaty did not contain by necessary implication a prohibition against the prosecution of the offender for any other crime than that for which he is surrendered does not seem to have been considered by the court, and much reliance is placed on the supposed interpretation of the treaty by the law officers of the crown in *Burley's Case*—a case so frequently mentioned in the correspondence between Mr. Fish and Lord Derby. The decision of the

court of appeals was rendered in 1874, long prior to the protracted and exhaustive discussion of the whole question in that correspondence and the debates in the house of lords. It may be added that two judges, one of whom was Mr. Justice FOLGER, the present secretary of the treasury, dissented.

The Case of Caldwell, 8 Blatchf. 131, upon the authority of which the subsequent Case of Lawrence was decided by the same judge, appears to have been treated by him as a question, not of jurisdiction, but of privilege from arrest. The provisions of the treaty, and the question considered by the Kentucky court as to prohibitions impliedly contained in it, do not appear to have been considered, nor is any reference made to the rules of international law, the opinions of foreign jurists, or the practice of civilized nations. The opinion seems to proceed on the erroneous supposition that Great Britain had definitely acquiesced in the construction contended for; and the Case of Heilbroun, so fully explained in subsequent discussions, is cited as a precedent, if not an authority. The decision, it may be added, was rendered in 1871, five years before the Case of Winslow arose. With the greatest respect for the eminent judge who decided this case, I am compelled to dissent from his conclusions.

The suggestion of the learned attorney general, in his opinion on the Case of Lawrence, that it was intended at least by Mr. Webster, by whom the treaty was probably drawn, to extend the practice with which he was familiar in cases of surrender of fugitives from justice between the states to cases of fugitives escaping into Canada, admits of an obvious answer. The states of this Union do not occupy towards each other the relation of foreign states, in the sense in which that term is applied to Great Britain or France. All the citizens of the states are citizens of the United States. They are in no sense aliens to each other. The distribution of powers between the states and the federal government requires that offenses against state laws should be prosecuted within the jurisdiction, the laws of which have been violated, but no right of asylum is gained by flight into another state. If the offender has violated the laws of the United States, he may be arrested without requisition or extradition wherever found within the limits of the Union.

The act of congress passed to carry into effect the constitutional provision for surrender of fugitives between the states, enacts that upon the demand of the executive authority of any state or territory, for the surrender of any fugitive from justice, and on the production of an indictment found, or an affidavit made before a magistrate of

any state or territory charging the person demanded "*with treason, felony, or other crime,* certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested," etc. Under this statute it has been held that no inquiry into the probable guilt of the fugitive can be made. The only inquiry is whether the warrant on which he is arrested states that the fugitive has been demanded by the executive of the state from which he is alleged to have fled, and that a copy of the indictment, or an affidavit charging him with having committed "treason, felony, or other crime," certified by the executive demanding him as authentic, has been presented. Whatever the statutes of the demanding state make indict-able is a crime within the constitution and law of congress on the subject. *In the Matter of Clark,* 9 Wend. 212. As the fugitive may be demanded for any crime, and as the surrendering state has no power to inquire into his probable guilt, or whether the crime for which he is demanded is made such by its own laws, it follows that when surrendered he may be tried for any crime he may have committed. But that fact lends no countenance whatever to a similar claim on the part of the receiving power under an extradition treaty with a foreign nation.

It remains to be determined whether the immunity from prosecution for crimes other than that for which the fugitive has been surrendered can be enforced by the court, or only by the intervention of the political branch of the government. This point has already been incidentally considered. If I am right in supposing, with the court of appeals of Kentucky, that the treaty, by necessary implication, prohibits the trial of the offender for any offense but that for which he has been extradited, the question is answered. The treaty is "the supreme law of the land," and as binding on the courts as a statutory enactment. If it contained an express prohibition the court would, beyond doubt, be deprived of jurisdiction. If by a just and reasonable interpretation the prohibition must be implied, the same result follows.

It may be added that, assuming that the receiving power has no right to try the fugitive except for the offense for which he has been surrendered, the immunity so guarantied is a right of the prisoner, and can be far more surely and conveniently asserted before the courts than by diplomatic intervention. The wealthy and influential criminal might generally be able to secure the interposition of

the surrendering government for his protection. But the poor and obscure offender might have no means of drawing the attention of that government to his case. It would be inconvenient, if not impossible, for the ambassador of the surrendering power to keep his eye on every case of an extradited fugitive with a view of interposing in case he should be put to trial for any other crime than that for which he was surrendered. If the protection of the fugitive be left solely to the political or executive power, the attempt to afford it would in the United States be attended by peculiar difficulties.

In cases where the extradition has been obtained for an offense against the laws of the United States the president could easily interfere, by directing the district attorney to abandon the prosecution. But when the criminal has been surrendered for an offense against the laws of a state, (as most frequently happens,) neither he nor the governor of the state has any such power. The latter may pardon, but he cannot control the district attorney or the court. In his correspondence with Lord Derby, Mr. Fish declared his inability to give the assurance demanded by the latter. If, therefore, the immunity of the fugitive cannot be enforced by the courts, it can in the United States be effectively secured only by an amendment to the treaty or by an act of congress, as suggested by the court of appeals of New York in the case heretofore cited. But this, for the reasons I have given, I believe to be unnecessary.

The only question presented for decision in the present case is whether a surrendered fugitive may be tried for an offense other than an "extradition crime." The principles attempted to be maintained, and the authorities cited, prohibit his trial for any other offense than that for which he has been surrendered. This prohibition, if rigorously applied, might often defeat justice. If, for example, the surrender be for an attempt to commit murder, and after surrender the person assaulted should die, or if (supposing larceny to be an extradition crime) the fugitive should be surrendered for robbery or burglary, and on examination of the proofs they should be found insufficient to show the force in the one case, and the effraction of the premises in the other; or if he should be surrendered for larceny and the offense should turn out to be embezzlement, or *vice versa*,—in these and similar cases the application of the rule would work a failure of justice. But it would not be difficult to provide for them by new treaty stipulations. It might be agreed that the extradited offender should be tried for the crime for which he has been surrendered, or for some other extradition crime based on the same facts or growing

out of the same transaction. In this or, some other way the statesmen of the two countries, whose interests and objects in this matter are identical, could surely devise means which, while the right of asylum would be sufficiently protected, would at the same time prevent that right from being so used as to afford immunity for crime.

Demurrer overruled.