In re EZETA. In re BOLANOS. In re COLOCHO. In re CIENFUEGOS.
In re BUSTAMANTE.

(District Court, N. D. California. Before MORROW, District Judge, sitting
as a Committing Magistrate. September 4, 1894.)

Nos. 11,095–11,099.

INTERNATIONAL EXTRADITION—JURISDICTION OF MAGISTRATE.

By the treaty between the United States and Salvador, they agree to
deliver up persons who, having been convicted or charged with certain
specified crimes committed within the jurisdiction of one of them, shall
seek an asylum or be found within the territories of the other. Rev. St.
U. S. § 5270 (Act Aug. 12, 1848), provides that, whenever there is a treaty
for extradition between the United States and any foreign government,
any justice of the supreme court, circuit or district judge, etc., may, on
complaint under oath charging any person found in any state, district, or
territory with having committed, within the jurisdiction of such foreign
government, any crime provided for by such treaty, issue his warrant for
the apprehension of the person so charged, that he may be brought before
him, to the end that the evidence of criminality may be heard and consid-
ered, etc. *Held*, that the jurisdiction of such justice or judge, sitting as a
committing magistrate in a case in which citizens of and fugitives from
Salvador are charged with extraditable crimes, is in no way affected by,
and he will not inquire into, the manner in which the persons so charged
came or were brought into the United States.

Applications for the extradition of Antonio Ezeta, Leon Bolanos,
Jacinto Colocho, Juan Cienfuegos, and Florencio Bustamante, under
the treaty between the United States of America and the republic
of Salvador. Plea to jurisdiction. Plea overruled.

The defendants in the above cases sought refuge on June 6, 1894, on board
the United States steamer Bennington, at the port of La Libertad, Salvador.
They requested an asylum until the arrival of the steamer San Blas, on its way
to Panama. Antonio Ezeta, one of the defendants, was the commander in
chief of the government forces, and the acting president of the republic, by
reason of the flight of his brother, Don Carlos Ezeta, who was the regularly
constituted president. The other defendants all occupied military positions
under General Antonio Ezeta. They had been unsuccessful in suppressing a
revolution against the then existing government, and had retreated from the
interior to the port of La Libertad, where they arrived with but a few hun-
dred men, and closely pursued by the forces of the insurgents. Their request
for an asylum was granted, and also as to 12 others who accompanied them,
but these latter persons are in no wise connected with these proceedings.
Three days later the steamer San Blas arrived at La Libertad, when the
commander of the Bennington proceeded to make arrangements for the trans-
fer of the fugitives on board the vessel. The arrangements were interrupted
by commissioners, representing the successful revolutionary party, request-
ing that they should have an opportunity to make a demand for the extradi-
tion of the fugitives on charges of murder, arson, robbery, and rape. The
fugitives were accordingly detained on board the Bennington, and, in view of
the disturbed condition of affairs in Salvador, this concession was deemed by
Capt. Thomas a courtesy to the new government, of some consequence, in the
favorable influence it would probably have upon the authorities, in securing
the safety of American citizens residing in that country. Upon the arrival
of the next vessel at La Libertad, bound for Panama, the fugitives again
requested permission to leave the Bennington, that they might take passage
on the departing steamer; but the request was refused by Capt. Thomas,
under instructions from the secretary of the navy. The Bennington remained
at La Libertad until July 25, 1894, during which time no extradition proceed-
ings, other than a demand by the government of Salvador for the surrender
of the fugitives, appears to have reached Capt. Thomas. The vessel then pro-

ceeded north with the five fugitives on board who are the subject of the extradition proceedings. The Bennington arrived at Acapulco, Mexico, July 30th or 31st, where a request on the part of the fugitives to be allowed to leave the vessel was again refused. Leaving Acapulco August 2d, the Bennington arrived off the harbor of San Francisco on the 14th of August. She, however, did not enter the harbor of the port of San Francisco, under instructions from the secretary of the navy, until the 23d of August, 1894, when warrants for the arrest of the fugitives were duly served by the United States marshal. The counsel for the defendants offered to show these facts in support of the plea to the jurisdiction of the committing magistrate, claiming that the defendants did not seek an asylum in this country, but were brought into the United States against their will, and that they were not found here according to law and the treaty, and that, therefore, the court had no jurisdiction.

Pierson & Mitchell, for the republic of Salvador.

Charles Page, Horatio S. Reubens, and Gonzalo De Quesada, for the defendants.

Charles A. Garter, U. S. Atty., for the United States.

MORROW, District Judge (orally). My jurisdiction in this case over the subject-matter and the persons accused is regulated and controlled by the treaty between the United States and the republic of Salvador, and the statute of the United States passed to execute such treaty and other treaties that may have been entered into by the United States. Therefore, in determining whether or not I have jurisdiction of the persons of the accused in this case, I must go to the law of the United States and the treaty, and determine from them what the jurisdiction is, and the limitations that have been placed upon it. The treaty has been referred to, and will again be cited upon this subject. Article 1 of the treaty between this country and Salvador is as follows:

"The government of the United States and the government of Salvador mutually agree to deliver up persons who, having been convicted of or charged with the crimes specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other."

Section 5270, Rev. St. (Act Aug. 12, 1848), under which treaties of extradition are carried into effect by the officers of the United States, provides that:

"Whenever there is a treaty or convention for extradition between the government of the United States and any foreign government, any justice of the supreme court, circuit judge, district judge, commissioner, or judge of a court of record of general jurisdiction of any state, may, upon complaint made under oath, charging any person found within the limits of any state, district, or territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered," etc.

Under the provision of this statute and the treaty, complaints were made before me, and warrants of arrest issued. The warrants were placed in the hands of the marshal. The marshal has made return to these warrants that he found these accused persons in this district, and brings them before the court. As is admitted by both sides, primarily this gives me jurisdiction to inquire whether or not

an offense has been committed, which, under the treaty, requires extradition proceedings. But it is said on behalf of the accused that they should now be permitted to introduce evidence tending to show that these persons were not in fact found within the territory of the United States, and did not seek an asylum within that territory. Is it incumbent upon me, as a judge or committing magistrate, to inquire whether or not these persons were found within the United States, or sought asylum, under the circumstances which the counsel offers to prove by testimony? In support of the contention that I may make such an inquiry, a number of cases have been cited. · I have not had an opportunity to examine all of them, but I think I understand the principles of law which have been declared in those cases.

As has been properly observed by counsel for the government of Salvador, there is a difference in the application of the law to interstate rendition cases and international extradition cases. This is clearly stated by Judge Jenkins in the case of In re Cook, 49 Fed. 836. So far as the rendition of fugitives between the states is concerned, the proceedings are governed by section 5278, Rev; St., which regulates the procedure and fixes the limitation of the court with respect to such matters. With respect to international extradition, I must consult the treaty, as I said before, and the acts of congress governing the proceedings, and such principles of law as have been declared by the courts. The question is the proper application of such principles of law. We must be very careful in considering the principles that have been declared by the courts, and apply them properly to facts to which they relate. The Case of Watts, reported in 8 Sawy. 370, 14 Fed. 130, has been cited. The Case of Rauscher, reported in 119 U. S. 407, 7 Sup. Ct. 234, has also been cited. The Case of Rauscher follows after the Case of Watts, and refers to the decision in that case. The Case of Watts was briefly this: Watts was indicted in this court for crimes arising under the laws of the United States. Watts fled to England. He was extradited, and brought back to this district. It was claimed on his behalf that he could only be tried for the crimes for which he had been extradited. Judge Hoffman held that an extradited fugitive could not, under the treaty of 1842 between the United States and Great Britain, be held to answer for an offense for which his surrender could not have been asked, and would not have been granted. This question afterwards came up before the supreme court of the United States in the Case of Rauscher. In that case, Rauscher had been indicted upon a charge of murder committed upon the high seas within the admiralty and maritime jurisdiction of the United States. He fled to England. He was extradited, and brought back to New York. The question in that case arose whether or not he could be tried upon the charge of beating and wounding a sailor on board a ship, it being admitted that the same witnesses and substantially the same testimony delivered in the case of beating and wounding would have been delivered in the case of murder. There were other questions involved in that case. The supreme court of the United States, following the Cases of Watts and others, held that

the person extradited could only be tried for the crimes for which he was extradited, unless, after having been tried for such crimes, a sufficient time had elapsed after being released for him to go to another country. It had been said in that class of cases that the reason why a person could not be tried for any crime other than the one for which the extradition had been made was that the court would not go behind the fact that the person was brought into the district within the jurisdiction of the court, and, he being in the jurisdiction of the court,—having been brought there, if you please, without authority of law,—nevertheless the court would not inquire as to how he had been brought within the jurisdiction. Had that doctrine been denied in the Case of Rauscher, it would have established the principle for all such cases that such an inquiry would be made by the court, but the decision in that case was not placed upon that ground. This is made clear by the case of Kerr v. People of Illinois, 119 U. S. 436, 7 Sup. Ct. 225, immediately following. The accused in that case had been indicted in Cook county, Ill., for larceny, the indictment including also charges of embezzlement. He had escaped, and gone to Peru. Extradition papers had been secured from the United States government, and agents of the government were dispatched to Peru to bring back the accused. The agents did not make use of the extradition papers, but took the person on board of the United States steamer Essex, in the harbor of Callao. The steamer Essex carried him to Honolulu, where he was transferred on board the City of Sydney, in which he was carried a prisoner to San Francisco, in the state of California. After being brought to California, he was then arrested on extradition papers that had been issued under the laws of the state; that is to say, he was taken upon interstate rendition papers,—the extradition papers procured from the United States not being made use of,—and he was transferred to the state of Illinois, where he was tried. His case went to the supreme court of the state, and from there to the supreme court of the United States. It was claimed on behalf of the accused, among other things, that he had been kidnapped in Peru, and transferred by the United States steamer Essex, by force, to Honolulu, and from there on board of the City of Sydney, and brought to San Francisco; that he had been refused an opportunity, from the time of his arrest in Lima until he was delivered over to the authorities of Cook county, of communicating with any person, or seeking any advice or assistance, in regard to procuring his release by legal process or otherwise; and he alleged that the proceedings were in violation of the provision of the treaty between the United States and Peru, and his rights under the constitution of the United States. The case was very carefully considered, and, as I said before, it followed immediately after the Rauscher Case. In order to point the distinction between the two cases, it is proper that I should now refer to a portion of the decision in the Case of Rauscher. In that case the court say:

"Upon a review of these decisions"—in which the Cases of Watts and others are reviewed—"upon a review of these decisions of the federal and state

courts, to which may be added the opinions of the distinguished writers which we have cited in the earlier part of this opinion, we feel authorized to state that the weight of authority and of sound principle are in favor of the proposition that a person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty can only be tried for one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings."

Following this case comes the Case of Kerr, the facts being as I have stated. The supreme court says, in concluding the opinion in the Kerr Case:

"The question of how far his forcible seizure in another country, and transfer, by violence, force, or fraud, to this country, could be made available to resist trial in the state court for the offense now charged upon him, is one which we do not feel called upon to decide, for in that transaction we do not see that the constitution or laws or treaties of the United States guaranty him any protection. There are authorities of the highest respectability which hold that such forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court. Among the authorities which support the proposition are the following: Ex parte Scott (1829) 9 Barn. & C. 446; Lopez and Sattler's Cases, 1 Dears. & B. Cr. Cas. 525; State v. Smith (1829) 1 Bailey, 283; State v. Brewster (1835) 7 Vt. 118; Dow's Case, (1851) 18 Pa. St. 37; State v. Ross (1866) 21 Iowa, 467; The Richmond v. U. S., 9 Cranch, 102. However this may be, the decision of that question is as much within the province of the state court as a question of common law or of the law of nations, of which that court is bound to take notice as it is of the courts of the United States; and, though we might or might not differ with the Illinois court on that subject, it is one in which we have no right to review their decision. It must be remembered that this view of the subject does not leave the prisoner or the government of Peru without remedy for his unauthorized seizure within its territory. Even this treaty with that country provides for the extradition of persons charged with kidnapping, and, on demand from Peru, Julian, the party who is guilty of it, could be surrendered and tried in its courts for this violation of its laws. The party himself would probably not be without redress, for he could sue Julian in an action of trespass and false imprisonment, and the facts set out in the plea would, without doubt, sustain the action. Whether he could recover a sum sufficient to justify the action would probably depend upon the moral aspect of the case, which we cannot here consider."

The prisoner himself cannot set up the mode of his capture by way of defense. Mahon v. Justice, 127 U. S. 700–717, 8 Sup. Ct. 1204. It is contended that, while this may be the law with respect to a case where a person is brought from a foreign country to this country for trial, it is not applicable to a case where a person has been found in the United States, and is to be extradited or returned to the country from whence he came. Still, the principles of law may be the same with respect to the two classes of cases. The fact is, there is no case in the books which presents precisely the same state of facts as we have in this case. As I said in the beginning, it is therefore necessary for us to apply to this case such principles of law as we may find applicable. The question is as to whether or not the principle involved in the Case of Kerr, as distinguished from the Case of Rauscher, is applicable to this case. It seems to me that, if anything, there is more of a limitation upon the judge in

inquiring into how the persons came into this jurisdiction in the present case than there would be in such a case as that of Kerr, and that the question, under this treaty and under the law, is simply for me to determine whether or not these defendants have been found here, and whether or not it is reasonable to believe they have committed the crimes charged against them. Let us see what position we would be in if we extended our investigation any further. The respondents propose to show, as I understand it, that they have been outraged by the executive department, by being brought to this country by force and against their will. The United States is not a party to the proceeding now before me. So far as these proceedings are concerned, it is between the republic of Salvador and these defendants. By the law of congress and by the treaty, the republic of Salvador is permitted to come before me, and say that these persons have been guilty of crimes in Salvador, and that, by an agreement which has been entered into between the United States and Salvador, they are entitled to come and have these persons returned to the country from whence they came. The United States simply furnishes the process, and furnishes the machinery for these proceedings. It is in accordance with the enlightened administration of law all over the world that criminals should be extradited for those crimes which are recognized as crimes by all nations. Therefore, the government of the United States simply furnishes the machinery for the extradition of persons charged with such crimes. It is not a party to these proceedings. If the United States is to be a party,—if it is to be charged here with having committed an outrage on these persons,—it should come before me, and should have an opportunity of saying whether or not it was proper for the commander of this vessel to take these parties. But that is not the position. That is not the fact. The United States is not before me, and these accused persons propose to show that they have been brought here by force by the United States in this case, and perhaps it might be, in some other case, by some German or British vessel, or some other power or party. It occurs to me that that plea is outside of the case. If the United States has done these parties an injustice, which I do not admit, undoubtedly the government of the United States will make reparation for it. If I should hold that these persons have committed a crime within the republic of Salvador, and should extradite them, the proceedings will be certified to the secretary of state for the action of the executive department. Whether, upon such certificate, the executive will extradite these persons, is a matter entirely in the judgment and discretion of the president of the United States and the secretary of state. I may hold that they have committed all the crimes charged against them, and that they should be extradited, and that they come within the treaty, but there is then no obligation resting on the president of the United States or the secretary of state to return them to Salvador. They may review the evidence in the case, and conclude that these crimes charged are peculiarly political offenses, and therefore within the cognizance of the executive department of this government to consider, no matter what I may determine; so that, this case being cer-

tified to the president of the United States and secretary of state, if they determine that these parties have been improperly brought within this jurisdiction, it is peculiarly within the province of the secretary of state and the president to so determine, and to act in accordance with their judgment in that respect. That this is the proper view to take of the situation in this case, and of the decisions that have been rendered in the various cases that have been cited, I think is fully sustained by a very able article in the American Law Review, for the month of August of this year, entitled "The Right to Try an Extradited Fugitive for an Offense Other than That Specified in the Extradition Proceedings." This article is by Ardemus Stewart, of Philadelphia. It is subject to the criticism that it refers to the question of trying a fugitive for a crime other than that for which he was extradited; but, as I said before, I think the principles of law are applicable here. Mr. Stewart reviews all of the cases that have been cited, and many others. He says:

"It is an elementary principle of criminal law that a court which has obtained jurisdiction of the person of the accused will not inquire into the means by which that jurisdiction was acquired. The mere fact of jurisdiction is all with which it is concerned. As was said above, a fugitive who has been kidnapped in a foreign country, and brought, forcibly and against his will, into the jurisdiction where he stands accused, will not be released on that ground, although the act of kidnapping is an offense against the government within whose territory he is found, as well as a plain violation of his personal right to freedom from arrest except by due process of law. So, too, the fact that an arrest is procured by fraud, or the employment of other illegal means to bring the criminal within the jurisdiction, will not entitle him to discharge. Whatever may be the illegality of the arrest in the place where made, as soon as the fugitive is brought, in pursuance of it, within the jurisdiction of the proper court, that jurisdiction attaches, and the subsequent proceedings are based upon that, without regard to the first arrest. When, therefore, the court has the fugitive within its jurisdiction, it has a perfect right to deal with him as far as its own laws permit, regardless of the fact that by so doing it may cause political complications with the surrendering government. The judiciary have nothing to do with the political relations of the government, these belonging wholly to the domain of the executive, as was acknowledged by Justice Gray in his concurring opinion in the Rauscher Case."

It seems to me the law here stated is applicable to the case before me; peculiarly so because whatever may be the evidence in this case, as interposed in support of this plea, it relates entirely to political matters, or to matters coming within the jurisdiction of the political department of the government.

I do not think, under any circumstances, it is proper for me to enter into an inquiry as to the conduct of a war vessel of the United States. In this case it appears, so far as the testimony has gone, that the Bennington was sent from this country to Salvador to protect American interests; that she proceeded to execute the commands of the executive department of the government. While there, these persons came on board the vessel, flying from the opposing forces in sight; and took refuge on board this vessel. It might be said with much force that when these persons took refuge on board of an American man-of-war, they were flying to the territory of the United States, and seeking asylum in the territory of the United States. It has been said that the deck of an American

public vessel is the territory of the United States. Then, when the fugitives came on board the Bennington, they came seeking asylum. "The right of asylum is frequently claimed by refugees, not only on the actual territory of a foreign state, but on board vessels belonging to that state, and even on board merchant vessels carrying its flag. A distinction must be drawn here. It is clear that, since a man-of-war is part of the public force of an independent state, and represents that state, in some respects, wherever it floats the national colors, it is, by a fiction of international law, considered a portion of the foreign territory to which it belongs. Hence, all nations admit, without difficulty and without any kind of restriction, the principle of exterritoriality in favor of the military marine, and waive, with respect to it, the right of searching for, pursuing, or claiming the persons who, having violated the civil or political laws of the country, have succeeded in sheltering themselves under the flag of a foreign man-of-war." Calvo's Dictionnaire de Droit International, Public, et Privé.

But it is said that when these fugitives went on board the Bennington they did so with the understanding that they would be transferred to another vessel. When a fugitive seeks an asylum in another territory, it is not for him to make conditions. As well might a person come into this country, and, stepping upon one of our docks, say: "I have come here seeking an asylum, but I want it distinctly understood that I must be transferred immediately to British Columbia, or some other territory. I am not to remain here." The political department of the government would say: "If you come seeking an asylum in this country, you come seeking it on such conditions as you find. We make no agreement with persons under such circumstances." So it may be said with respect to persons coming on board an American man-of-war. When they come there they are subject to the rules governing the vessel,—to the directions that may be given to the officer in command,—and it is not for fugitives to say whether they shall be placed on shore, or on another vessel. So, there is even much in this view of the case opposed to the plea of jurisdiction.

At all events, on the whole case, as it appears to me, without entering into a critical review of these cases in detail, which I have not had the time to examine carefully, I think the principle of law is as I have stated. The plea to the jurisdiction is therefore overruled, and the objection to the evidence is sustained.

Mr. Page: We had hoped that we might be allowed to take this testimony, in order that when the case is certified, if it be necessary to certify it, these facts might be included in the case presented to the political department.

THE COURT: I have considered the possibility of a motion of that kind being made. In view of what I have said,—that this plea is peculiarly one that addresses itself to the executive department, and if I shall hold these persons as having come within the provisions of the treaty, and therefore to be extradited, that question may be reviewed by the executive department upon such evidence,—

I have determined, in case you make that motion, to allow the testimony to be taken, and certify it with the other evidence in the case.