**In the Matter of the EXTRADITION OF Sukhminder SINGH a/k/a "Sukhi".**

**In the Matter of the EXTRADITION OF Ranjit Singh GILL a/k/a "Kukki".**

**Magistrate Nos. 87–6160G–01, 87–6161G–01.**

United States District Court, D. New Jersey.

Sept. 1, 1987.
Supplemental Opinion Sept. 11, 1987.

See also, D.C., 123 F.R.D. 127, D.C., 123 F.R.D. 140.

Judy G. Russell, Sp. Asst. U.S. Atty., Fleming, Merrill, Roth & Russell, Newark, N.J., for plaintiff.

William M. Kunstler, Ronald L. Kuby, New York City, for defendants.

## OPINION

RONALD J. HEDGES, United States Magistrate.

## INTRODUCTION

On July 27, 1987, Sukhminder Singh and Ranjit Singh Gill, defendants in these extradition proceedings commenced by the Government on behalf of the Republic of India (*see* 18 U.S.C. § 3184), moved for a continuance to allow them to conduct discovery. After having reviewed the motion papers, together with the Government's opposing brief and the applicable law, the Court denied the motion by Letter–Order filed July 31, 1987.[1] This opinion sets forth the basis for that ruling.[2]

This opinion will address whether defendants have a constitutional right to discovery and whether the Court may, as an exercise of inherent power, afford discovery. Defendants' specific requests for discovery will then be addressed. However, the Court deems it appropriate to first review the nature of extradition proceedings.

## DISCUSSION

A. *The Nature of Extradition Proceedings.*

"Orders of extradition are *sui generis.*" *Jhirad v. Ferrandina,* 536 F.2d 478, 482

(2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); *see United States v. Doherty,* 786 F.2d 491, 498 n. 9 (2d Cir.1986); *In re Extradition of Pazienza,* 619 F.Supp. 611, 618 (S.D.N.Y.1985). As the Supreme Court explained in *Charlton v. Kelly,* 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913),

> 'the proceeding ... is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations, which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused ... to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him.' [229 U.S. at 460, 33 S.Ct. at 949 (*quoting Benson v. McMahon,* 127 U.S. 457, 463, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888))].

*See, e.g., Collins v. Loisel,* 259 U.S. 309, 312, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922); *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977); *Jhirad v. Ferrandina, supra,* 536 F.2d at 482.[3]

■ Given the limited nature of an extradition hearing, a defendant's proofs are limited. "[E]vidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may

---

1. Defendants did not submit a brief with their motion papers. Instead, they relied on the Fifth and Sixth Amendments.

2. Defendants came before the Court for initial appearances on May 15, 1987. At that time an extradition hearing was scheduled for July 14, 1987. See Order filed May 20, 1987. However, at defendants' request, the hearing was adjourned to the week of August 24, 1987.

 By Letter–Order filed July 2, 1987, the Court advanced the hearing date to the week of August 3, 1987. Being unable to conduct the hearing during that week, the Court thereafter restored the August 24th date. See Transcript of July 10, 1987 telephone conference at p. 2, ll. 6–11.

 On August 17, 1987, defendants requested a further adjournment to allow their attorneys to

conduct an investigation and prepare for the hearing. That application was granted. Defendants were directed to report to the Court on October 13, 1987 as to their progress, with the hearing tentatively scheduled for the week of November 2, 1987. See Order filed August 31, 1987.

 The Court has elected to issue its opinion at this time as a guide to defendants in their preparation for the hearing.

3. Judicial review is also limited. "A petition for a writ of habeas corpus is the only mechanism by which the defendant can seek review." *Quinn v. Robinson,* 783 F.2d 776, 787 n. 3 (9th Cir.1986), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

properly be excluded...." *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). Likewise, a defendant may not pose questions of credibility. *See, e.g., Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *In re Extradition of Locatelli*, 468 F.Supp. 568, 573–74 (S.D.N.Y.1979).

This limitation on a defendant's proofs was discussed in *In re Extradition of Sindona*, 450 F.Supp. 672 (S.D.N.Y.1978), as follows:

> The distinction between 'contradictory evidence' and 'explanatory evidence' is difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting 'explanatory evidence,' *the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.* The Supreme Court has twice cited with approval a district court case which aptly summarizes the relevant considerations. The Supreme Court decisions are *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, [472], 66 L.Ed. 956 (1922), and *Charlton v. Kelly*, 229 U.S. 447, 461, 33 S.Ct. 945, [949], 57 L.Ed. 1274 (1913). The district court opinion is *In re Wadge*, 15 F. 864, 866 (S.D.N.Y.1883), in which the court dealt with the argument of an extraditee that he should be given an extensive hearing in the extradition proceedings:
>
> > 'If this were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.' [450 F.Supp. at 685 (emphasis added) ].

*See In re Ezeta*, 62 F. 964, 992 (N.D.Ca. 1894) (explanatory evidence "does not contradict or impugn the testimony on the part of the prosecution, but serves to explain it so as to show that the consequence otherwise deducible does not follow"). Thus, if discovery is permissible it must be confined to the purpose of the extradition hearing and to the limitation on defendants' proofs.[4]

With these principles in mind, the Court will address the issues before it.

### B. *Is There a Constitutional Right to Discovery?*

■ Defendants rely on the Fifth and Sixth Amendments in support of their mo-

---

**4.** The Supreme Court has only recently affirmed the limited nature of extradition proceedings (albeit interstate extradition pursuant to 18 U.S. C. § 3182). In *California v. Superior Court of California*, 482 U.S. 400, 107 S.Ct. 2433, 96 L.Ed. 2d 332 (1987), the Supreme Court recognized that

> [t]he language, history, and subsequent construction of the Extradition Act make clear that Congress intended extradition to be a summary procedure. As we have repeatedly held, extradition proceedings are 'to be kept within narrow bounds'; they are 'emphatically' not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party. *Biddinger v. Commissioner of Police*, 245 U.S. 128, 135 [38 S.Ct. 41, 43, 62 L.Ed. 193] (1917).... Those inquiries are left to the prosecutorial authorities and courts of the demanding State.... The courts of asylum States may do no more than ascertain whether the requisites of the Extradition Act have been met. [107 S.Ct. at 2438].

tion.[5] The Court concludes that neither afford discovery as a matter of right.

"There is no general constitutional right to discovery in a criminal case...." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977).[6] However, in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), the Supreme Court held that the Due Process Clause "forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." 412 U.S. at 472, 93 S.Ct. at 2211. The Supreme Court stated:

> Although the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, but cf. *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), it does speak to the balance of forces between the accused and his accuser....

> \* \* \* \* \* \*

> We do not suggest that the Due Process Clause of its own force requires Oregon to adopt such provisions [for reciprocal discovery].... But we do hold that in the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State. [412 U.S. at 474–76, 93 S.Ct. at 2211–13 (footnote omitted)].

*Wardius* is inapplicable here. No request for discovery has been made by the Government. In any event, whatever pretrial discovery defendants may be entitled to is a matter for the courts in India should they be extradited.

5. See note 1 above.

6. The Court deems extradition proceedings analogous to criminal prosecutions for the purpose of this discussion. *See First National City*

There remains for discussion *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.

However, "[t]he requirements of *Brady* are not based on any general constitutional right to discovery in criminal cases, but rather on a defendant's due process right to a fair trial." *United States v. Higgs,* 713 F.2d 39, 42 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984); *cf. United States v. Murphy,* 569 F.2d 771, 773–74 (3d Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978) (surrender of *Jencks* material may not be compelled in pre-trial discovery or at preliminary hearing). The timing of disclosure of *Brady* information requires a focus on "when disclosure is necessary to insure ... a fair trial." *United States v. Higgs, supra,* 713 F.2d at 43.

Since an extradition proceeding is not a criminal prosecution, it is questionable whether *Brady* is applicable. *See Merino v. United States Marshal,* 326 F.2d 5, 13 (9th Cir.1963), *cert. denied,* 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1964). In any event, since there will not be a *trial* in the United States, *Brady* is inapplicable.

Defendants' reliance on the Sixth Amendment is easily disposed of. "The Sixth Amendment by its terms applies only to 'criminal prosecutions,' and an extradition proceeding is not a 'criminal prosecution.'" *Caltagirone v. Grant,* 629 F.2d 739, 748 n. 9 (2d Cir.1980) (*quoting Jhirad v. Ferrandina, supra,* 536 F.2d at 485 n. 9); *see Sabatier v. Dambrowski,* 453 F.Supp. 1250, 1255 (D.R.I.), *aff'd,* 586 F.2d 866 (1st Cir.1978); *Freedman v. United States,* 437 F.Supp. 1252, 1264–65 (N.D.Ga.

*Bank v. Aristeguieta,* 287 F.2d 219, 226 & n. 7 (2d Cir.1960), *vacated,* 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963).

1977). "Hearsay evidence is admissible.... Unsworn statements of absent witnesses may be considered.... There is no inherent right to the confrontation and cross-examination of witnesses." *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir.1980).

Defendants do not have a constitutional right to discovery. The Court will now consider whether, as an exercise of its inherent power, it may allow discovery.

## C. *May Discovery Proceed as an Exercise of Inherent Power?*

The leading decision on the inherent power of a court to permit discovery in extradition proceedings is *First National City Bank v. Aristeguieta*, 287 F.2d 219 (2d Cir.1960), *vacated*, 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963). In considering the request of Venezuela (which sought extradition of an accused) for discovery, the Second Circuit Court of Appeals assumed, without deciding, that a court might possess such inherent power:

> Preliminarily, it may be noted that we are not called upon to approve of a situation where a court, in which the Federal Rules of Civil Procedure are not mandatory, has borrowed a relatively minor provision from these Rules.... Nor are we faced with a situation where an extradition magistrate has filled in gaps in the extradition treaties and statutes by fashioning his own procedure in relation to minor and essentially collateral matters.... Even a hasty glance at the complex and interrelated issues and arguments raised by the parties to this appeal clearly reveals that *we are confronted with a basic procedural innovation having far reaching consequence in the field of international extradition.*
>
> In this connection the recent Supreme Court decision of *Miner v. Atlass*, 1960, 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462, is significant. Holding invalid a District Court admiralty rule which authorized the taking of oral depositions for the purpose of discovery only, the Court stated:

> 'The problem then is one which peculiarly calls for exacting observance of the statutory procedures surrounding the rule-making powers of the Court ..., designed to insure that basic procedural innovations shall be introduced only after mature consideration of informed opinion from all relevant quarters with all the opportunities for comprehensive and integrated treatment which such consideration affords. Having already concluded that the discovery-deposition procedure is not authorized by the General Admiralty Rules themselves, we should hesitate to construe General Rule 44 as permitting a change so basic as this to be effectuated through the local rule-making power,....' 363 U.S. at page 650, 80 S.Ct. at page 1306.

The Miner case, of course, is not cited as authority that the procedural innovation sought to be used in this case is or is not within the rule-making power of the Supreme Court, or that the extradition magistrate may or may not be authorized to order the taking of depositions under any circumstances. *Implicit in Miner, however, is the warning that federal courts must proceed with extreme caution when asked to sanction basic procedural innovations which lie in that misty land where judicial and legislative powers meet. Moreover, when called upon to justify such innovations on the basis of inherent power, the courts should be doubly cautious that the exercise of this power is appropriate to the particular case.* Although neither the Treaty nor the statutes provide for the taking of depositions in the asylum country, Venezuela argues that 'Certainly the extradition judge must be, and under the Treaty is, free to establish some method of proceeding.' Such a principle would give to each individual judge unlimited power on an *ad hoc* basis to create whatever procedure he might choose. Procedural chaos could easily result. The Federal rules both criminal and civil were carefully drafted to avoid such a situation. In all likelihood the number of occasions for international ex-

tradition was not sufficiently large to justify the codification of procedural rules which should apply thereto. *In a field as important from a national foreign policy point of view, it should not be the function of judges individually or collectively to write such a code.* If there are to be 'procedural innovations' of general application, they should come as suggested by the Supreme Court ... 'only after mature consideration of informed opinion from all relevant quarters with all the opportunities for comprehensive and integrated treatment which such consideration affords.' Until such time as a procedural code of general application in international extradition is written, we are convinced that any power in the extradition magistrate to create his own rules or procedures should be limited to situations where the exercise of that power is essential in the particular case. Thus, before deciding what, if any, power resides in the extradition magistrate to authorize depositions, it is necessary to determine what circumstances might justify the use of this supposed power, and whether these circumstances exist in the instant case. [287 F.2d at 224–26 (footnotes omitted) (emphasis added) ].

Subsequent decisions have concluded, without discussion, that a court possesses discretionary power to allow discovery. *See In re Extradition of Kraiselburd,* 786 F.2d 1395, 1399 (9th Cir.1986), *cert. denied,* 479 U.S. 990, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986); *Quinn v. Robinson,* 783 F.2d 776, 817 n. 41 (9th Cir.1986), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *Sabatier v. Dambrowski, supra,* 453 F.Supp. at 1255; *Jhirad v. Ferrandina,* 377 F.Supp. 34, 37 (S.D.N.Y.1974), *aff'd,* 536 F.2d 478 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

In considering the existence of implied power to permit discovery, *Aristeguieta* relied on *Miner v. Atlass,* 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960). The Supreme Court discussed *Miner* in *Colgrove v. Battin,* 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), in which a local

rule which provided for a six-person jury in civil trials was upheld. The Supreme Court explained that

> *Miner* struck down a local rule authorizing discovery-deposition practice in admiralty cases. A court of admiralty had no inherent power, independent of statute or rule, to order the taking of depositions for the purpose of discovery. In 1939, this Court omitted this 'basic procedural innovation' from among the Civil Rules adopted as part of the Admiralty Rules. *Miner* held that this omission 'must be taken as an advertent declination of the opportunity to institute the discovery-deposition procedure of Civil Rule 26(a) throughout courts of admiralty,' *id.* [363 U.S.], at 648 [80 S.Ct. at 1304], and therefore ... that the local rule 'is not consistent with the present General Admiralty Rules....' *Id.,* at 647 [80 S.Ct., at 1304]. In contrast, we hold in this case that Local Rule 13(d)(1) is not inconsistent with Fed.Rule Civ.Proc. 48.
>
> *Amicus* also suggests that *Miner* should be read to hold that all 'basic procedural innovations' are beyond local rulemaking power and are exclusively matters for general rulemaking. We need not consider the suggestion because, in any event, we conclude that the requirement of a six-member jury is not a 'basic procedural innovation.' *The 'basic procedural innovations' to which Miner referred are those aspects of the litigatory process which bear upon the ultimate outcome of the litigation and thus, 'though concededly "procedural," may be of as great importance to litigants as many a "substantive" doctrine....'* 363 U.S., at 650 [80 S.Ct., at 1305]. [413 U.S. at 163–64 n. 23, 93 S.Ct. at 2456–57 n. 23 (emphasis added) ].

The Court is satisfied that discovery in extradition proceedings is a "basic procedural innovation," as was the discovery sought in *Miner. See First National City Bank v. Aristeguieta, supra,* 287 F.2d at 225 ("we are confronted with a basic procedural innovation having far reaching consequence in the field of international extradition").

Congress did provide a means by which defendants in extradition proceedings may secure evidence. 18 U.S.C. § 3191 provides:

On the hearing of any case under a claim of extradition by a foreign government, upon affidavit being filed by the person charged setting forth that there are witnesses whose evidence is material to his defense, that he cannot safely go to trial without them, what he expects to prove by each of them, and that he is not possessed of sufficient means, and is actually unable to pay the fees of such witnesses, the judge or magistrate hearing the matter may order that such witnesses be subpenaed; and the costs incurred by the process, and the fees of witnesses, shall be paid in the same manner as in the case of witnesses subpenaed in behalf of the United States.

The purpose of Section 3191 is "to afford the defendant the means for obtaining the testimony of witnesses and to provide for their fees." *Charlton v. Kelly, supra,* 229 U.S. at 458, 33 S.Ct. at 948. Accordingly, this Court disagrees with *Aristeguieta* to the extent that it may have concluded there to be "a procedural vacuum in the extradition treaties and statutes." 287 F.2d at 224. To the contrary, Section 3191 manifests congressional consideration of the means by which a defendant may secure evidence. *See Charlton v. Kelly, supra,* 229 U.S. at 458, 460–61, 33 S.Ct. at 948, 949–50; *Merino v. United States Marshal, supra,* 326 F.2d at 13.[7]

■ Extradition proceedings have a limited purpose. Defendants have only a limited statutory right to secure evidence. Indeed, to permit extensive discovery (such as that sought by defendants here) raises the concern expressed in *In re Wadge,* 15 F. 864 (S.D.N.Y.1883), that a government seeking extradition might be compelled to, in effect, try its case against a defendant here. 15 F. at 866. Given the foregoing, and the implications for our foreign relations, the Court is satisfied that it should not permit discovery through the exercise

of inherent power. Instead, discovery in extradition proceedings should be permitted, if at all, only through Act of Congress.

Notwithstanding the foregoing analysis, the Court is not satisfied that it possesses inherent power to allow discovery. "The inherent powers of federal courts are those which 'are necessary to the exercise of all others.' *United States v. Hudson,* 7 Cranch 32, 34 [3 L.Ed. 259] (1812)." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980).

In *Roadway Express,* the Supreme Court relied on *United States v. Hudson,* which held that the circuit courts of the United States had no common law jurisdiction in criminal cases. *United States v. Hudson,* 11 U.S. (7 Cranch) 21, 22–23, 3 L.Ed. 259 (1812). In *Hudson,* the Supreme Court discussed implied power as follows:

Certain implied powers must necessarily result to our courts of justice, from the nature of their institution. But jurisdiction of crimes against the state is not among those powers. To fine for contempt, imprison for contumacy, enforce the observance of order, &c., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others: and so far our courts, no doubt, possess powers not immediately derived from statute; but all exercise of criminal jurisdiction in common-law cases, we are of opinion, is not within their implied powers. [11 U.S. (7 Cranch) at 23].

Thus, as an exercise of their inherent power over members of their bars, courts may impose sanctions on attorneys. *Roadway Express, Inc. v. Piper, supra,* 447 U.S. at 764–67, 100 S.Ct. at 2463–65; *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 560–68 (3d Cir.1985) (*en banc*). This Court simply cannot conclude that the allowance of discovery in extradition proceedings is a power "necessary to the exercise of all

---

7. *Merino* held that Section 3191 does not authorize the taking of depositions in a foreign country. 326 F.2d at 13.

others." [8]

## D. *Defendants' Requests for Discovery.*

The Court has concluded that it has no inherent power to allow discovery and that defendants have no constitutional right to discovery. Assuming these rulings to be erroneous, the Court will now turn to defendants' specific requests for discovery. In so doing, the Court has taken into consideration "the well-entrenched rule that extradition proceedings are not to be converted into a dress rehearsal trial" and that discovery should appreciably advance the resolution of a contested issue. *Jhirad v. Ferrandina, supra,* 536 F.2d at 484; *see Quinn v. Robinson, supra,* 783 F.2d at 817 n. 41.[9] The Court will first address discovery which pertains to the existence of probable cause. The Court will then address discovery as to the "Political Offense Exception."

### *Discovery as to Probable Cause*

By way of introduction, the Government has agreed to respond to two requests for discovery. The Government will produce statements made by defendants to Government agents and will also produce all prior warrants or process issued against defendants in India with regard to the offenses for which extradition is sought.[10] Further, at a conference conducted on August 17, 1987, the Court directed the Government to produce the redacted transcript of the confession of Sukhdev Singh, together with the transcript of his appearance before an Indian magistrate prior to the confession. See Order filed August 31, 1987; paragraph 25, Affidavit of Amod K. Kanth; paragraphs 17 and 18, Affidavit of Chatervedula Prabhakar.[11]

*Depositions.* Defendants wish to depose all witnesses identified in the affidavits

---

**8.** *Eash* recognized that "the term inherent power has been employed in three general fashions." 757 F.2d at 562. The first "encompasses an extremely narrow range of authority involving activity so fundamental ... that to divest the court of absolute command within this sphere is really to render practically meaningless the terms 'court' and 'judicial power.'" 757 F.2d at 562 (*quoting Levin & Amsterdam,* "Legislative Control Over Judicial Rule–Making: A Problem of Constitutional Revision," 107 *U.Pa.L.Rev.* 1, 30–32 (1958)). Discovery is not such a fundamental activity.

The second fashion in which inherent power is used is "said to arise from the nature of the court." 757 F.2d at 562. Implied power as used in this fashion was discussed in the text above with regard to *Roadway Express* and *Hudson.*

"The third form of authority subsumed under the general term inherent power implicates powers necessary only in the practical sense of being useful." However, "courts may exercise this kind of inherent power only in the absence of contrary legislative direction." 757 F.2d at 563. Given 18 U.S.C. § 3191, which affords only a limited right to obtain evidence, the Court is satisfied that there has been such a "contrary legislative direction." Moreover, given the limited purpose of extradition proceedings and the limitation on a defendant's evidence, the Court is not convinced that discovery would be "highly useful in the pursuit of a just result." Indeed, this form of implied power appears to implicate the *Miner* analysis set forth in the text above. *See* 757 F.2d at 564 (*citing Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903), which authorized bail in an extradition proceeding in the absence of

statutory authority, as an example of this third form of judicial power).

**9.** It must be borne in mind that "the mere wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal." *Collins v. Loisel, supra,* 259 U.S. at 316, 42 S.Ct. at 472.

**10.** Given the Government's agreement, the Court expresses no opinion on the merits of these requests.

The Government's agreement, and this Court's direction, disposes of the requests for discovery made in paragraphs 35, 36 and 40 of the Affirmation in Support of Motion of Ronald L. Kuby. It should be noted that the Court did not direct the production of documents through the exercise of any inherent power to compel discovery but did so as an exercise of its power to compel the Government to submit additional proofs on the existence of probable cause.

**11.** According to these affidavits, submitted by the Government for introduction at the extradition hearing, *see* 18 U.S.C. § 3190, Singh may have implicated defendant Gill in the murders of Lalit Maken, Geetanjali Maken and Balkishan Khanna and the attempted murder of Suresh Malik on July 31, 1985. Singh implicated defendant Singh in the murder of A.S. Vaidya on August 10, 1986.

The Court expresses no opinion as to the admissibility of any affidavit submitted by the Government. As of the date of this opinion, the Court has considered the affidavits solely for the purpose of ruling on defendants' motion and familiarizing itself with the charges against them.

submitted by the Government, together with all affiants. See paragraphs 16 through 21, Affirmation in Support of Motion of Ronald L. Kuby ("Affirmation"). Defendants offered no purpose for these depositions in their moving papers.

■ This request is denied for several reasons. First, it is nothing more than a "blanket" request for discovery, which is inconsistent with the limited purpose of extradition proceedings. *See In re Extradition of Kraiselburd, supra,* 786 F.2d at 1399. Second, such broad discovery would convert this proceeding into a full scale trial, which it cannot be. *See Eain v. Wilkes, supra,* 641 F.2d at 511; *Jhirad v. Ferrandina, supra,* 377 F.Supp. at 36. Third, there is nothing to suggest that any deposition would produce *explanatory* evidence.[12]

*"Sukhvinder Singh/Sukhminder Singh."* Defendant Singh contends that he may have been misidentified in several warrants issued by courts in India. See paragraphs 22 through 28, Affirmation. Specifically, one request for an arrest warrant related to the August 10, 1986 murder of A.S. Vaidya names both "Sukhminder" and "Sukhvinder" Singh as the accused. Exhibit 1, Prabhakar affidavit.[13] Similarly, an arrest warrant related to a January 6, 1986 bank robbery names "Sukhvindar" Singh as the accused. Exhibit 3, Affidavit

of Dharanpal Bholanath Bangia.[14] Defendants seek discovery into this alleged misidentification.

■ This Court must determine whether defendant Singh is the person sought by India. *See Hooker v. Klein,* 573 F.2d 1360, 1367 (9th Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *In re Extradition of Demjanjuk,* 612 F.Supp. 544, 547–54 (N.D.Ohio 1985). However, "[f]orm is not to be insisted upon beyond the requirement of safety and justice," and identification of an accused by different names in judicial documents does not bar extradition. *Fernandez v. Phillips,* 268 U.S. 311, 312, 313, 45 S.Ct. 541, 542, 543, 69 L.Ed. 970 (1925).[15]

■ If the Government attempted to establish identity solely on the basis of defendant Singh's name, there might be a different question. However, the Government intends to offer photographic identifications and fingerprint and handwriting analyses, any of which may identify him as the person whose extradition is sought. Under these circumstances, and subject to admissibility of the Government's proofs, this discovery would not appreciably advance the resolution of the issue of identification.[16]

*Photographic Identifications.* Various affiants identified defendants on the basis

12. Defendants would conduct depositions through letters rogatory. See paragraph 21, Affirmation. Federal courts have been held to possess inherent power to issue these. *See United States v. Staples,* 256 F.2d 290, 292 (9th Cir.1958). Even assuming such power to exist, "execution of the letter in the first instance rests upon principles of international comity, and is in that sense discretionary with the issuing American court." *In re Anschuetz & Co., Gmbh,* 754 F.2d 602, 609 n. 17 (5th Cir.1985), *vacated,* —— U.S. ——, 107 S.Ct. 3223, 97 L.Ed.2d 730 (1987). Thus, for the reasons described in the text, this Court would not issue letters even if it had the power to.

13. The arrest warrant names "Sukhminder Singh" as the accused. Exhibit 2, Prabhakar affidavit. Both the request for issuance of the warrant and the warrant also identify the accused by the alias "Sukhi."

14. The request for an arrest warrant names "Sukhminder" Singh as the accused. Exhibit 2, Bangia affidavit. Both the request and the war-

rant also identify the accused by the alias "Sukhi."

15. "The warrant is said to be bad because it names Mariano Viamonte, and not Mariano Viamonte Fernandez, the appellant. He is named both ways in the proceedings and is identified by testimony. There is nothing in this objection...." *Fernandez v. Phillips, supra,* 268 U.S. at 313, 45 S.Ct. at 543.

16. The Court will make separate determinations of extraditability as to each offense for which extradition is sought. *See Demjanjuk v. Petrovsky,* 776 F.2d 571, 583–84 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Shapiro v. Ferrandina, supra,* 478 F.2d at 906–07; *Freedman v. United States, supra,* 437 F.Supp. at 1259. Accordingly, identification will be determined on an offense-by-offense basis.

of photographs taken after their arrests in the United States. Defendants seek discovery "as to the facts and circumstances surrounding the viewing of the photographs ... to explain the suggestive cirucmstances [sic] surrounding the viewing." Paragraph 32, Affirmation.

■ This request is denied for two reasons. First, despite defendants' statement to the contrary, the Court is satisfied that any evidence of "suggestiveness" with regard to a photographic identification would tend to contradict or impeach, rather than explain, that identification. Such evidence is inappropriate here. *See In re Extradition of Demjanjuk, supra,* 612 F.Supp. at 552; *In re Assarsson,* 635 F.2d 1237, 1245–46 (7th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981). Second, the restrictions on suggestive and unnecessary identification procedures proscribed by the Due Process Clause protect an *evidentiary* interest at *trial.*[17] *Manson v. Brathwaite,* 432 U.S. 98, 113–14, 97 S.Ct. 2243, 2252–53, 53 L.Ed.2d 140 (1977). "Objections to evidence on the ground that it was acquired by unlawful means are not properly made at the preliminary examination." *Fed.R.Crim.P.* 5.1(a); *see Giordenello v. United States,* 357 U.S. 480, 484, 78 S.Ct. 1245, 1249, 2 L.Ed.2d 1503 (1958). The suggestiveness of a photographic identification may not be inquired into here.

*"The Torture of Sukhdev Singh."* As discussed above, Sukhdev Singh implicated defendants in a confession. With regard to that confession, defendants state:

As noted by Amnesty International reports, torture of suspects in aid of interrogation is a serious problem in cases involving political opposition to the Indian Government. The defense will be seeking complete discovery with respect to Sukhdev Singh's medical treatment, conditions of confinement, and related matters. [Paragraph 34, Affirmation].

In *Abu Eain v. Adams,* 529 F.Supp. 685 (N.D.Ill.1980), *aff'd sub nom. Eain v.*

*Wilkes,* 641 F.2d 504 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed. 2d 208 (1981), the District Court denied the petitioner's request for issuance of a writ of habeas corpus. In so doing, the District Court adopted the opinion of the magistrate who certified the petitioner's extraditability. 529 F.Supp. at 687–68. The magistrate's opinion is appended to the District Court's. 529 F.Supp. at 688–95.

■ The principal document which implicated the petitioner in *Abu Eain* was the confession of a co-conspirator. In limiting the petitioner's proofs with regard to that confession, the magistrate held:

The suspected 'voluntariness' of the Yasin statement, because of the 'usual' manner by which these are given and the 'recanting' thereof by Yasin were sought to be introduced by the accused. That effort was refused because I may only receive evidence offered by the accused that explains or clarifies the demanding country's proof. The accused does not have the right to contradict the demanding country's proof or pose questions of credibility. [529 F.Supp. at 691].

The Court adopts the magistrate's reasoning in *Abu Eain.* Defendants challenge Suhkdev Singh's credibility. They also challenge the reliability of Suhkdev Singh's confession. Those challenges should be made in an Indian court. *See* discussion of "Photographic Identifications" above; *Shapiro v. Ferrandina, supra,* 478 F.2d at 904–05.[18]

*"Secret Witnesses."*[19] Paragraph 37 of the Affirmation states that

[t]he documents in support of the extradition of both respondents made repeated references to the testimony or statements of unnamed 'witnesses.' The documents also refer to the testimony of two specific unnamed witnesses, whose identities the Governments of India and the United States refuse to produce. De-

---

**17.** Once again, the Court deems analogy to criminal law to be appropriate.

**18.** Defendants are cautioned on any attempt to have this Court take judicial notice of confes-

sion-related procedures in India. *See Eain v. Wilkes, supra,* 641 F.2d at 512 n. 9.

**19.** The discovery sought in paragraph 43 of the Affirmation is dealt with here.

fense counsel will be moving for production of the names and addresses of all such witnesses, or for alternative relief, including the dismissal of the complaints. The "specific unnamed witnesses" are referred to in the Kanth affidavit. Paragraph 27 of that affidavit recites that

> [s]tatements have been recorded from two witnesses, whose identities have not been disclosed for their protection, who spoke to Ranjit Singh Gill a/k/a 'Kukki' in early 1986. Both of these witnesses knew that Gill ultimately left India using the name 'Yashpal Kashyap.' I have been informed by United States investigators that, at the time of his arrest on May 14, 1987, Ranjit Singh Gill a/k/a 'Kukki' admitted that he had entered the United States using the name 'Yashpal Kashyap.' These two witnesses stated that, when they met Ranjit Singh Gill a/k/a 'Kukki' in early 1986, he told them he intended to flee to the United States because the police has discovered that he was one of the gunmen who had shot Lalit Maken and the others.

■ In part, these two witnesses merely corroborate defendant Gill's own statement. The Government has agreed to give that statement to him. To the extent that the witnesses corroborate Gill's flight to the United States, that flight was conceded by counsel at the initial appearance. To the extent that the witnesses implicate Gill in three murders and an attempted murder on July 31, 1985, the Government does not intend to rely solely on their statements. See generally affidavits of Amod K. Kanth and Suresh Malik. These extradition proceedings are not a discovery device for defendants with regard to any trial in India. This discovery would not appreciably advance the resolution of any contested issue.[20]

*"Original Descriptions and Original Suspects.* Defendants seek discovery of "eyewitness descriptions ... provided *before* the police had suspects and conducted photo show-ups." Paragraph 38, Affirmation. Defendants allege that the Indian authorities have suspects for several crimes defendants are accused to have committed, and seek "production of files and documents depicting all persons for whom warrants were obtained...." Paragraph 39, Affirmation.

■ The Court can conceive of no purpose for this discovery other than to contradict the Government's proofs or to prepare for trial in India. The request is denied.

*"Handwriting Report."* The Government will offer into evidence the affidavit of M.K. Kanabur, who compared certain documents secured by the Indian authorities to the handwriting of "Sukhminder Singh Sandhu." Defendants seek production of Kanabur's "actual report, as well as his qualifications." Paragraph 42, Affirmation.

■ The Court agrees with the Government that "[t]he affidavit *is* the report to which they [defendants] are entitled," and that Kanabur's qualifications "are explicitly set forth therein in paragraphs 1-4." Memorandum of Law of the United States at 43. The request is denied.

### Discovery as to "Political Offense Exception"

Article 6 of the extradition treaty be-

---

20. The Court is uncertain of the "repeated references to the testimony or statements of unnamed 'witnesses'" referred to in the Affirmation. See Memorandum of Law of the United States at 42 ("All of the essential facts on which probable cause rests are attributed, either directly or by inference"). There is no doubt that the Indian authorities intend to present additional evidence of defendants' guilt at their trial in India. See, for example, paragraph 28, Kanth affidavit. The Government has no obligation to present all evidence here, but need only present evidence sufficient to determine probable cause.

In any event, the Court agrees with the Government's position that the fact that witnesses are unnamed "goes to the question of the weight the Court may choose to give the witnesses' statements and not to the admissibility of the statements." Memorandum of Law of the United States at 42.

tween the United States and India[21] provides as follows:

A fugitive criminal shall not be surrendered if the crime or offence in respect of which his surrender is demanded is one of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for a crime or offence of a political character. [47 Stat. 2122].

Defendants seek expansive discovery as to this "Political Offense Exception." See Paragraphs 62 through 74, Affirmation.[22]

 "The operative definition of 'political offenses' under extradition treaties as construed by the United States limits such offenses to acts committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion." *Eain v. Wilkes, supra,* 641 F.2d at 518; *see, e.g., Quinn v. Robinson, supra,* 783 F.2d at 792–810; *In re Ezeta, supra,* 62 F. at 997–1005. This "incidence test has two components—the 'uprising' requirement and the 'incidental to' requirement." *Quinn v. Robinson, supra,* 783 F.2d at 806. The question presented is whether resolution of the contested issue of the applicability of Article 6 would be appreciably advanced by discovery.[23]

With regard to the "uprising" component of the incidence test, the defendants offer the following summary of the Hindu–Sikh conflict in India:

51. The conflicts reached the point of no return on June 5, 1984, when Indian Army, Naval, Air Force, and para-military units, under the command of General Vaidya, launched 'Operation Bluestar,' an attack on the Golden Temple complex in the holy city of Amritsar. The hugh [huge] Temple complex housed many thousands of pilgrims, who had flocked there in recent days to commence religious celebrations. The Golden Temple is the holiest place in the Sikh religion, comparable to the Vatican, the West Wall, or Mecca.

52. Many thousands of innocent people were massacred in the attack, and Sikh religious shrines were sacked and burned.

53. The entire Punjab was placed under martial law, communication lines were cut, and Sikh villages surrounding Amritsar were attacked by Vaidya's forces.

54. Shortly thereafter, India instituted The National Security (Amendment) Ordinance 5 and 5A, and the Terrorist Affected Areas (Special Courts) Acts of

---

21. The actual treaty is between the United States and Great Britian. India acceded to that treaty. See paragraph 3, Declaration of JoAnn Dolan.

22. Article 6 appears to distinguish between "pure" and "relative" political offenses. The former are acts directed against the state, such as sedition, treason and espionage, and are never extraditable. The latter are simply "common crimes with political overtones." *Eain v. Wilkes, supra,* 641 F.2d at 523 n. 24; *see Quinn v. Robinson, supra,* 783 F.2d at 793–94. None of the offenses with which defendants are charged are pure political offenses.

23. The Court is satisfied that defendants bear the burden of proof on this issue. Article 6 allocates the burden to defendants: "if he proves … a crime or offence of a political character." Independent of this explicit language, analogy to criminal law supports the Court's conclusion.

"[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."

*Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977). The well-established elements which the Government must establish in extradition proceedings do not include inapplicability of the Political Offense Exception. *See, e.g.,* 18 U.S.C. § 3184; *Zanazanian v. United States,* 729 F.2d 624, 625–26 (9th Cir.1984); *United States v. Barr,* 619 F.Supp. 1068, 1070 (E.D.Pa.1985); *In re Extradition of Sindona,* 584 F.Supp. 1437, 1446 (E.D.N.Y.1984). Accordingly, the Court concludes that the Political Offense Exception is analogous to an affirmative defense (such as extreme emotional disturbance), the burden of proof of which may be allocated to a criminal defendant. *See Patterson v. New York, supra,* 432 U.S. at 205–11, 97 S.Ct. at 2324–27. *Compare Eain v. Wilkes, supra,* 641 F.2d at 520 (burden of proof of applicability of Political Offense Exception on defendant) *and Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972) (same) *with Ramos v. Diaz,* 179 F.Supp. 459, 463 (S.D.Fla.1959) (burden of production of defendant; burden of persuasion on Government).

1984, providing for, *inter alia,* detention without charge; summary trials; special courts in which the judges are political appointees of the Central Government and the right to confrontation is suspended; secret trials; and the abolition of the presumption of innocence.

55. On October 31, 1984, in retaliation for the attack on the Golden Temple, Indira Gandhi was assassinated, allegedly by two of her Sikh bodyguards.

56. During the next six days, primarily in the Hindu city of Delhi, anti-Sikh riots erupted. Thousands of Sikhs were lynched; Sikh homes and temples were attacked and burned, and Hindu authorities either did nothing or joined in the attacks.

57. Many political leaders helped to organize anti-Sikh riots. Lalit Maken was observed offering a Hindu mob money and liquor to encourage it to attack Sikh property.

58. During the years following the riots on November, 1984, the political and social situations in India, generally, and the Punjab, in particular, have disintegrated still further.

59. Numerous armed, clandestine Sikh organizations have emerged to fight for *Khalistan,* (literally, 'clean place'), an independent Sikh nation in the Punjab.

60. The Central Government has responded by limiting still further autonomy in the Punjab; resort to the Special Courts; paramilitary and police attacks on civilians; and the routine use of torture and murder of those in police custody.

61. Increased political repression has also manifested itself by police fabrication of cases against political dissidents. [Affirmation (footnote omitted)].

Having purported to summarize the conflict in India, defendants seek the following discovery:

BAINS COMMISSION REPORT

62. In 1985, an Indian High Court Justice, Ajit Singh Bains, filed a report on specific cases falsified by the police in an attempt to curb Sikh dissenters.

63. The Bains Commission Report focused on charges brought against Sukhminder Singh and Ranjit Singh Gill, for the murder of the senior police superintendent of the City of Ludhiana. The Bains Commission Report also discusses murder charges brought against Ranjit Singh Gill.

64. The Commission found all of the charges to be fabrications by the police.

65. Despite these findings, the charges were not dismissed by Indian authorities. Indeed, although none of these charges are the basis of extradition requests, the Affidavit of Chatervedula Prabhaker, filed in support of the request for the extradition of Suhkminder Singh, makes reference to respondent being wanted for the Ludhiana murder.... The defense will seek discovery of the Bains Commission Report.

STATUTES, ORDINANCES AND DEBATE AND LEGISLATIVE FINDINGS RELEVANT THERETO

66. The Sikh struggle for national liberation has spawned extensive repressive legislation throughout the country. The defense will seek the text of the following statutes and ordinances, along with the text of their legislative histories:

a. The Punjab Disturbed Areas Act

b. The Armed Forces (Punjab and Chandigarh) Special Powers Act

c. The National Security Act and all amendments thereto

d. The Terrorists and Disruptive Activities Act

e. The Essential Services Maintainence Act

67. This legislation has transformed India, at least for Sikhs, into a police state where civil liberties are suspended. All such statutes are relevant to demonstrating the existence of an on-going, violent political dispute in India.

REPORTS OF SPECIAL COMMISSIONS, WHITE PAPERS, AND RELATED DOCUMENTS

68. The disintegration of due process of law for Sikh dissidents has been the subject of extensive study by Govern-

mental, quasi-governmental, and private organizations in India.

69. The defense will move for the discovery of all white papers, special reports, commission reports and findings addressing:

a. The use of torture by police officials from 1978 to date;

b. Operation Bluestar and its aftermath, including the imposition of martial law;

c. The role of General A.S. Vaidya in Operation Bluestar;

d. Anti–Sikh riots and massacres from 1978 to date, with special emphasis on the murders of Sikhs following the assassination of Indira Gandhi;

e. The role of civilian politicians, including Lalit Maken; police officials and officers; and other civilian leaders in the fomenting, encouraging, and/or failure to restrain or prevent anti-Sikh violence;

f. Deaths in police custody, from 1978 to date, including the use of the so-called 'false encounter,' cited by Amnesty International; and

g. Efforts made to implement Amnesty International's recommendations to prevent police torture and murder in police custody;

### ANTI–SIKH ACTIVITIES BY LALIT MAKEN

70. The defense will move for the production of all public statements, legislation, and writings by Lalit Maken which evince bias or prejudice against Sikhs, or which attempted to restrict the civil liberties and human rights of members of the Sikh religious faith.

\* \* \* \* \* \*

### RAJASTHAN STATE POLICE AND HOME GUARDS

74. Reports, documents, white papers, or other information related to anti-Sikh activities by the Rajasthan State Police and Home Guards will be sought

by the defense. [Affirmation (footnotes omitted)].

With regard to the foregoing requests for discovery, defendants caution that,

[t]his affirmation is submitted to assert the type of discovery that will be sought, rather than an argument on the merits for specific requests. Nonetheless, this Court should bear in mind that documents easily available from the Indian Government are not necessarily available to respondents without judicial intercession. [Note 4, paragraph 65, Affirmation].

■■■ Discovery is inappropriate for several reasons. First, most of the areas of discovery relate to acts or occurrences which may be established by defendants through affidavit, see 18 U.S.C. § 3190, or testimony, if permitted by the Court. See Hooker v. Klein, supra, 573 F.2d at 1369. In this regard, the Court notes that defense counsel intend to travel to India and that, notwithstanding their need for adjournments to prepare for a hearing, counsel already has five or six witnesses who are prepared to testify on the Political Offense Exception. Transcript of July 10, 1987 telephone conference at p. 4, 1. 18 to p. 5, 1. 2. Second, at least one defendant is represented by William M. Kunstler, Esq., who identified himself at the initial appearances as "general counsel" for the "National Sikh Council" in the United States.[24] Defendants thus appear to have the support of a national organization in the United States which may assist them in securing evidence.

Nothing submitted by defendants demonstrates that they cannot secure evidence on the "uprising" component without discovery. Indeed, the very nature of an "uprising," as defined by the federal courts, lends itself to proof by affidavit or testimony without the need for discovery. The existence of an "uprising" as widespread as defendants allege cannot be hidden away in government files.

With regard to the "incidental to" component, the emergence of "armed clandestine

**24.** The title and name may not be exact.

Sikh organizations" was described in paragraph 59 of the Affirmation. Defendants go on to state:

71. Upon information and belief, numerous organizations exist now and during the period relevant hereto, that are fighting for the establishment of the Sikh Nation of Khalistan and/or against repression by the Central Government. The defense will make detailed discovery requests for information about these organizations....

72. Allegations or reports that respondents are members of any armed, clandestine organization such as those described above, and details relevant to such membership.

73. Information, documents and other materials which indicate that respondents' conduct was motivated by political considerations, rather than personal gain [Affirmation].

Defendants seek discovery to establish that they are members of a clandestine Sikh organization and that their crimes, if any, were politically motivated. However, these are questions peculiarly within their capacity to answer. For that reason alone resolution of the Political Offense Exception issue would not be appreciably advanced by discovery. *See Jhirad v. Ferrandina, supra*, 536 F.2d at 484. Further, as discussed above, defendants may present evidence through affidavit or testimony.[25]

## CONCLUSION

The Court is satisfied that defendants have no constitutional right to discovery and that it does not possess inherent power to afford discovery. In any event, given

**25.** The Court is in receipt of correspondence from the United States Attorney dated August 25, 1987. This reported that defense counsel had applied for a special permit "for travel in restricted and border areas such as the Punjab," that such permits were "very rarely granted to foreigners," and that India would not issue the permits since "the offenses for which extradition is sought occurred in areas of India which are neither restricted nor border areas." See Paragraphs 4 and 5, Notice of Compliance filed August 24, 1987.

This recent development is no reason for reconsideration of any ruling above. First, it ap-

the limited nature of extradition proceedings, defendants' requests for discovery are inappropriate.[26]

## SUPPLEMENTAL OPINION

### INTRODUCTION

On July 31, 1987, defendants' motion for a continuance to allow them to conduct discovery was denied. The basis for that ruling was set forth in an Opinion filed September 1, 1987 ("the Opinion") which addressed, at pages 111 through 112, whether defendants had a due process right to discovery.

After the Opinion was filed several decisions came to the attention of the Court which considered discovery in a due process context. This Supplemental Opinion addresses those decisions.

### DISCUSSION

No reported decision discusses discovery sought by a defendant in an extradition proceeding as a matter of due process. However, in *Sayne v. Shipley*, 418 F.2d 679 (5th Cir.1969), *cert. denied*, 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970), the Fifth Circuit Court of Appeals rejected a defendant's argument that he had been denied due process under a Canal Zone statute which permitted that territory's Governor, rather than a judicial officer, to determine whether the defendant was extraditable to the Republic of Panama. The Governor's determination to extradite had been sustained by the District Court, which dismissed the defendant's petition for a writ of *habeas corpus*.

pears that defense counsel will be free to "see the crime scenes or consult with witnesses [at the scenes]." Second, it appears that Indian nationals will be free to travel and meet with defense counsel and that the distances involved are not prohibitive.

**26.** Defendants may seek collateral review of these rulings. "[A] habeas court can determine whether the magistrate's decision to deny discovery constituted an abuse of discretion...." *Quinn v. Robinson, supra,* 783 F.2d at 817 n. 41.

The Fifth Circuit noted that "[t]he automatic hearing appellant contends is a constitutional right is statutorily authorized [by 18 U.S.C. § 3184] in most United States extradition proceedings to foreign countries." 418 F.2d at 684. Having reviewed the limited nature of a Section 3184 hearing, the court held:

> In the framework of the special relationship between the Republic of Panama and the Canal Zone we think the long established procedure applicable to this case under the treaty and statutory provisions cannot be deemed invalid under the Constitution. They provide for the determination by the Chief Executive of the Canal Zone that the crime charged was committed and that the person to be extradited committed it. This determination is subject to judicial review by *habeas corpus* in the United States District Court which may fully inquire into the evidentiary basis for the extradition order of the Governor.... Petitioner has had a complete judicial hearing on all issues that would have been pertinent to extradition proceedings pursuant to 18 U.S.C.A. § 3184. In our view, the Constitution requires no more.
>
> *The Due Process clause guarantees appellant the right to a hearing prior to extradition.* That right may be satisfied by a statutorily required hearing, as is done in most United States international extradition cases, or, as was done here, by a full habeas corpus hearing.... Affording appellant the right to a full habeas corpus review of his pending extradition does not deprive the appellant of due process of law. [418 F.2d at 686 (footnote omitted) (emphasis added)].

In *Escobedo v. United States,* 623 F.2d 1098 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980), the defendants, who had been determined to be extraditable to the Republic of Mexico, appealed from the dismissal of their *habeas* petitions. The court rejected one of their arguments on appeal as follows:

> Article IV of the Extradition Treaty, on its face, invests the Executive Branch of each treaty party with discretion to surrender its own nationals.... Despite this language, petitioners contend that ... they are not subject to extradition to Mexico....
>
> First, petitioners argue that the discretion given the Executive under Article IV violates due process because no standards are provided to guide the exercise of this discretion. We reject this argument. Contrary to petitioners' suggestion, a United States citizen may not be whisked away to a foreign country for trial by Executive whim. Under 18 U.S. C. § 3186, the Secretary of State may not surrender any person to a foreign government unless the person has been found extraditable by a magistrate at a hearing held under 18 U.S.C. § 3184. *Executive discretion arises only if the magistrate determines that there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty.' Id. These statutory provisions safeguard the fugitive's due process rights....*
>
> Assuming that the magistrate's decision is in favor of extradition, the Executive's discretionary determination to extradite the fugitive—even one who is a United States national—is not generally subject to judicial review. The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs.... This principle was applied in *Peroff v. Hylton, supra* [563 F.2d 1099 (4th Cir.1977)], a case involving the United States–Sweden Extradition Treaty. Article VII of that treaty is substantially identical to Article IV of the Treaty with Mexico. The petitioner in *Peroff,* a United States citizen, characterized the Executive's exercise of discretion to extradite nationals under Article VII as an 'administrative determination' and claimed that he was entitled, as a matter of due process, to a hearing before the Secretary of State on the propriety of his extradition. Holding that it would be improper for a court to impose such a hearing requirement, the Fourth Circuit stated:

The need for flexibility in the exercise of Executive discretion is heightened in international extradition proceedings which necessarily implicate the foreign policy interests of the United States. Thus, while Congress has provided that extraditability shall be determined in the first instance by a judge or magistrate, 18 U.S.C. § 3184, the ultimate decision to extradite is 'ordinarily a matter within the exclusive purview of the Executive.'

563 F.2d at 1102. The court concluded that the requirements of procedural due process were satisfied by the hearing provided under 18 U.S.C. § 3184 and by habeas corpus review. *Id.* at 1102–03.

The same sensitivity to the Executive's role in foreign affairs, which prompted the *Peroff* court's refusal to prescribe the procedures by which the Executive exercises its discretion over the extradition of nationals, causes us to reject petitioners' argument that this discretion should be confined within specific standards. [623 F.2d at 1104–06 (footnotes omitted) (emphasis added)].

■ *Sayne* and *Escobedo* confirm that a defendant in an extradition proceeding has a due process right to a hearing before being extradited. The question presented here is whether the Court's denial of defendants' motion denies them a fair hearing.

"Due process guarantees that there is a *fair* decisionmaking process before official action is taken which directly impairs a person's life, liberty or property...." *In re Complaint of Bankers Trust Company,* 752 F.2d 874, 886 (3d Cir.1984). In *Bankers Trust Company,* the appellant argued that the District Court's refusal to invoke a commission to take testimony in India denied her due process. The Third Circuit Court of Appeals considered that argument under the following principles:

The constitutional sufficiency of procedures provided in any situation varies with the circumstances. In evaluating the procedures in any case, we must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government. *Marroquin–Manriquez v. Immigration and Naturalization Service,* 699 F.2d 129, 134 (3d Cir.1983). [752 F.2d at 887].

The court acknowledged that discovery rulings are generally accorded "'the narrow review reserved for discretionary decisions based on first-hand observations.'" 752 F.2d at 889 (*quoting United States v. Criden,* 648 F.2d 814, 817 (3d Cir.1981)). However, the District Court had not articulated any reason for its ruling, and the Third Circuit could not "perceive a reason—good or otherwise—for refusing to issue a new commission...." 752 F.2d at 890. The Third Circuit then concluded that

[w]hile many procedural and evidentiary errors do not automatically give rise to due process violations, in our view, the errors here constituted a gross abuse of discretion which affected the fundamental fairness of the proceedings below.

*Due process mandates that a judicial proceeding give all parties an opportunity to be heard on the critical and decisive allegations which go to the core of the parties' claim or defense and to present evidence on the contested facts....* The validity of the release and the special power of attorney upon which it is predicated are critical and decisive issues of petitioner's claim. At virtually every stage of the proceedings, the district court's rulings inhibited Mrs. Chatterjee's [the appellant] ability to substantiate her allegations of fraud and forgery. The court's procedural rulings placed Mrs. Chatterjee in the proverbial Catch–22. She had a property interest at stake and in order to protect that interest she sought procedures to attempt to prove that the release was fraudulently executed. We believe that she was erroneously deprived of this interest by virtue of the district court's rulings. In this regard, petitioner was denied the procedural fairness that the fifth amendment assures to all persons who, whether intentionally or by vicissitudes of fate, find

their lives, liberty or property in the hands of the courts of the United States. [752 F.2d at 890–91 (emphasis added)].

The circumstances *sub judice* must be evaluated in light of *Bankers Trust Company*.

Defendants are illegally in the United States and have been in federal custody since May 14, 1987. There is nothing in the record to establish that defendants have been "continuously present" as that term is used in evaluating their liberty interest. *See Marroquin–Manriquez v. Immigration and Naturalization Service*, 699 F.2d 129, 134 (3d Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Nevertheless, defendants' "life" and "liberty" interests are implicated since they are in custody and India wishes them extradited and put on trial for various crimes.

The Government has a substantial interest. As observed previously, "to permit extensive discovery ... raises the concern ... that a government seeking extradition might be compelled to, in effect, try its case against a defendant here." Opinion at 115. Extensive discovery would be contrary to the limited nature of extradition proceedings and the limitation on a defendant's proofs. *See* Opinion at 110–111. Discovery must be deemed "a basic procedurial innovation having far reaching consequence in the field of international extradition." *First National City Bank v. Aristeguieta*, 287 F.2d 219, 225 (2d Cir.1960), *vacated*, 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963).

Based on its review of defendants' specific requests for discovery, *see* Opinion at 115–123, the Court is satisfied that there is minimal (if any) risk of an erroneous deprivation of their constitutionally-protected interests. Further, to provide "additional or different procedural safeguards" through discovery would run counter to the Government's interest. The denial of defendants' motion does not deny them due process. *See Marroquin–Manriquez v. Immigra-*

*tion and Naturalization Service, supra*, 699 F.2d at 135–36 (refusal of immigration judge to allow defendant in deportation proceeding to conduct discovery in Mexico not denial of due process where discovery "sounds more in rhetoric than in substance" and information sought not relevant to proceeding); *In re Randall*, 640 F.2d 898, 902–03 (8th Cir.1981) (refusal to permit respondent in disbarment proceeding to take depositions not denial of due process where such discovery was improper "attempt to obtain the mental impressions" of the decisionmaking bodies); *Sharon v. Time, Inc.*, 599 F.Supp. 538, 556–63 (S.D.N.Y.1984) (refusal of plaintiff and foreign state to permit discovery in libel action not denial of due process where information sought already in defendant's position, discovery went to "tangential" issues, and discovery requests overbroad).

There may be some uncertainty in this area. Defendants in criminal cases have no *general* constitutional right to discovery. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). However, in *Bankers Trust Company*, a civil action, the Third Circuit Court of Appeals recognized that, "[w]hile many procedural ... errors do not automatically give rise to due process violations," an erroneous discovery ruling which constitutes a gross abuse of discretion may affect the fundamental fairness of a proceeding. 752 F.2d at 890. These principles may be reconciled by concluding that, although a litigant has no *general* constitutional right to discovery, there may be circumstances under which *specific* discovery must be afforded as a matter of due process. No such circumstances are present here.[1]

## CONCLUSION

Defendants have no general constitutional right to discovery. Moreover, defendants have not been denied due process by

---

1. In any event, only the most egregious errors should be of constitutional dimension in extradition proceedings, since a defendant's proofs are limited and "the mere wrongful exclusion of

specific pieces of evidence, however important, does not render the detention illegal." *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922).

the denial of any specific request for discovery.